AMERICAN SURETY COMPANY, appellant,

*v.*

WILLIAM F. CONWAY et al., respondents.

[Decided October 11th, 1917.]

On appeal from a decree of the court of chancery advised by Vice-Chancellor Stevens, who filed the following opinion:

This is a creditor's bill. The pertinent facts are undisputed. James Conway was a contractor. He became interested in a contract made with the town of Wakefield by the firm of Minahan & Costa, and he joined in a bond of indemnity given to the complainant, the American Surety Company, which had guaranteed the proper performance of the work. The contractors defaulted; the town sued in the Massachusetts courts and recovered judgment. Thereupon the complainant paid the amount recovered ($45,439.11) and sued Conway, on the indemnity bond, in the supreme court of this state. Conway died pending suit and judgment was recovered against his administratrix for $56,133.75 damages and $296.73 costs. This judgment was affirmed in the court of errors.

The indemnity bond was executed on June 26th, 1901. The notification to discontinue work was given to the contractors by the town of Wakefield on January 13th, 1902. Conway conveyed to his sister, the defendant, Annie L. Conway, the first and eleventh tracts mentioned in the bill on January 28th, 1902. On the same day he conveyed the second and third tracts therein mentioned to one Dolan; the fourth tract to one of his daughters, and the fifth to another. On January 22d he conveyed the sixth, seventh, eighth, ninth and tenth tracts to his son, William F. Conway. By a series of conveyances made subsequently, William became the holder of the legal title to all the lots, except the two conveyed to Annie. I need not particularize these conveyances, for it was admitted that the conveyances of the various lots, while in the hands of William, were fraudulent and void as against the creditors of James Conway. As to Annie's lots it is said that they were founded upon valuable consideration.

I will first consider the lots that William held. The defence is that they are now held by William's wife, Isabelle, who became a *bona fide* purchaser of them for value without notice.

On this branch of the case there is little or no dispute about the facts. It is rather a question of the proper inference to be drawn from them. William met Isabelle McGrath for the first time at Atlantic City in 1907. He was a member of the bar, having been graduated from the Yale Law School in 1900, and having been admitted to practice here in 1901. She was a dressmaker in Brooklyn, about twenty-eight years old when she first met him, with a business, the annual profit of which, just before her marriage in July, 1912, was, she says, from $2,500 to $3,000. William seems to have been continuously attentive to her from the time he first met her until November, 1911, when he proposed marriage and was refused. In January, 1912, he proposed again and was again refused. She says: "I laughed at him and I said no, I wouldn't. I didn't want to get married, because I had a good business and I was making good money." "I can do just as I please with my money." After that she did not see him so often until June, 1912. On June 9th William met her in New York and asked her if she would not go to Newark with him. She says that she had never been in Newark before, except to

pass through it from one depot to another, and that it being "kind of nice to go to a place you had never seen," she accepted the invitation. Her story told in her own words is as follows:

"When we got to Newark, he took me around and showed me the different properties he owned. After he showed me all the properties, he asked me if I would marry him, if he would give me that property, and I said, will you give me all that you showed me, and he said yes, I will give you all that property; and then I asked Mr. Conway what the income of it was and he told me at the time, and I said, well, I will think it over, and Mr. Conway said, as near as I remember, 'Well, if you make up your mind to accept me, you know we have to have this in legal form or writing,' or something like that; and he said, of course we have to have a lawyer. and I said, well, anyone you want to suggest; he said, well, Mr. Darrow; I know Mr. Darrow and you know Mr. Darrow * * * I said, well, that is agreeable to me, and he said, well, you think it over."

In order that the full significance of what occurred a few days later may be understood, it will be well to consider the then situation. The judgment was obtained by the town of Wakefield in the Massachusetts court in June, 1911. Suit on the bond was commenced against James Conway in the supreme court of this state in August of that year, but not tried until November of the following year. There was first a verdict for defendant which was set aside. A new trial had, in April, 1914, resulted in the judgment upon which the present bill was filed. In April or May, 1912, William had consulted his friend Darrow, whom he had met at Yale as a fellow law student and who was then practicing law in New York City. He wanted his opinion as to whether marriage was a consideration valuable enough to be good against his father's creditors. After examining the question, Darrow gave it as his opinion that marriage would be held to be a valuable consideration if the grantee stood as a *bona fide* purchaser without notice. A few weeks after getting this opinion he took Miss McGrath to Newark on the trip described. Within a day or two Miss McGrath saw Darrow and instructed him to draw up a marriage agreement. This he did. By its terms William was to convey the property and they were to be married on or before the 1st day of July following. On July 1st they were married, very quietly, in a Newark church. Before the ceremony was performed William handed his fianceé a deed conveying the

property. They made a wedding trip of three weeks and then returned to Newark and took up their residence in his father's home. It is argued that William's wife did not take immediate possession of all the property, but I think the evidence shows that her conduct was such as to indicate that she regarded the property as hers and asserted dominion over it in a perfectly natural and becoming way. She has always claimed to be the owner of it, and as far as appears, no member of the household has failed to recognize her as such or claimed any beneficial interest in it.

Now, William and Darrow both admit that they knew that the transfer was in fraud of complainant's right, if he had a right, which was then being contested. William's purpose in offering to convey was twofold. He wanted to protect the property against the possible judgment and he wanted to offer to Miss McGrath a sufficient inducement to marry him. According to his own story he only held the property in trust for his father, and yet he says that he did not inform him of his proposed action. He was, from a moral standpoint, guilty of a double wrong. The wrong he did his father was moral and not legal, for his father had no legal redress against him and seems in point of fact either to have acquiesced in or to have approved of his son's conduct. He was old and dying, and felt, no doubt, that as far as he was concerned, the transfer would, from a practical standpoint, make no difference to him.

If the transfer could be avoided for the fraud of the grantor alone, of course, it would fall; but the law is that the grantee, for valuable consideration, must concur in or have notice of it if such is to be the result. *Tantum* v. *Green, 21 N. J. Eq. 364.* That marriage is a valuable consideration is undisputable. *Prewit* v. *Wilson, 103 U. S. 22;* and so the inquiry is narrowed down to the question of notice. Isabelle says that she did not have notice, and in this she is corroborated by William and Darrow. Their testimony accords with the probabilities. It is not likely that knowing, as they did, that notice would defeat the very object aimed at, they would have given notice. It is virtually conceded that she had no actual notice, but, it is said, she had constructive notice, in that the situation was such as to have put

her upon inquiry. This is the only debatable question in the case.

Now, it seems to me that the situation was not such as to put her upon inquiry. We must view it from her standpoint—from the standpoint of what she herself knew. She had known William for five years. His attention during all that time had been such that when in November, 1911, he first asked her to marry him, she must have thought that he had a sincere affection for her. She twice refused him on the ground that while she liked him she did not like him well enough to give up her business and her independence. Living in a different city she had never met any member of his family. She knew nothing about their pecuniary circumstances. She knew only that William was a lawyer of eleven years' standing, and, as it is phrased in the proofs, "a liberal spender." The property, assessed at $64,000, had, most of it, stood in his name undisturbed for ten years. She knew nothing about the circumstances under which he had acquired it. Knowing this, and nothing more, when William showed her the property and told her that it was his, and that it brought in a net rental of two hundred or two hundred and fifty dollars a month—about the sum she was making in her business—she no doubt reasoned that he was giving her little more than an equivalent for what *she* was giving up; that the offer was a practical demonstration of his genuine affection and the very sacrifice that was her due; and that, in any event, they would enjoy the property together during their joint lives.

It is said that her conduct was mercenary, but if it was, that does not help the argument. It must be remembered, too, that she was a business woman of over sixteen years' experience in making bargains, and knew perhaps better than most girls the value of a business arrangement. Looking at the circumstances from her standpoint, and with her limited information, I cannot say that there was anything in what she knew to put her upon inquiry.

Then it is said that the law is that if a man transfers to a woman *all* his property in consideration of marriage, the transaction is *per se* fraudulent. The authorities are somewhat conflicting on this question, but they are inapplicable, for the reason

that William did not give up all. Whether she thought he was giving up all is a different question—a question to which these authorities do not apply.

It is further argued that if Isabelle had no notice of the intended fraud, Darrow, her legal adviser, had, and she is affected with his knowledge. The case of *Vulcan Detinning Co.* v. *American Can Co., 72 N. J. Eq. 387,* has settled the law on this point. The rule, as there established, is that the knowledge of the agent is chargeable upon his principal, whenever the principal, if acting for himself, would have received notice of the matters known to the agent. Under this rule, Isabelle is not affected with notice. Darrow had acquired his knowledge weeks, if not months, before he saw Miss McGrath, while acting only for William. It is certain, as I have already said, that whether Miss McGrath had acted for herself or through some agent other than Darrow, the facts that constituted the notice would not have been communicated, and the case does not, as complainant contends, come within the modification of the rule suggested by Mr. Justice Dixon in the *Sooy Case, 41 N. J. Law 395.* William did *not* refrain from giving notice because he knew that Darrow was aware of the facts and he did *not* deal with Darrow on the basis of those facts. Paraphrasing the words of Mr. Justice Dixon, it would be unfair and unreasonable to assume that express notice would have been given if Darrow had not, to his (William's) knowledge, been cognizant of the situation.

It is further insisted that Miss McGrath had constructive notice of what the tenants would have told her, had she made the inquiry. For the vacant lots there were no tenants; in the case of the lots built upon, had the inquiry extended to Garrabrant, the agent who collected the rents, she would have learned that they were being paid to James Conway. That would have indicated that James had some interest and that she would take subject thereto. The doctrine of notice in cases of this class is intended to protect those in possession, not those who may, by possibility, have some adverse claim against the possessors. The knowledge to be imputed is that which would have been communicated, not that which would have been withheld. It would cover facts admitted, not facts denied. Had the tenants or Gar-

rabrant been interrogated, they would have said that the rents were being paid to James Conway. Had James been interrogated, he would have said that William was living with him and that he had given him a deed of the property. It would be carrying the doctrine of imputed knowledge to a fantastic extreme to hold that such replies as these, or similar ones, coming from an old man on the brink of the grave, would, or ought to, have suggested to Miss McGrath, had she made the inquiry, that the conveyances were intended as a fraudulent contrivance to protect the property against James' creditors, and not as a family settlement. *Wood* v. *Price, 79 N. J. Eq. 621,* contains a discussion of the question whether possession by a tenant is constructive notice not only of the tenant's rights but of the landlord's. The court of errors and appeals decides that it is notice of both. Mr. Justice Voorhees says: "The purchaser is therefore chargeable with notice of the facts which he would have learned had he pursued such inquiry, not only as to the tenant's title, but as to all the facts and circumstances, which the *tenant knew concerning the title.*" This decision is far from sustaining the contention that an inquiry as to the tenants' knowledge should have been followed by a further inquiry as to the landlord's (assuming James Conway to have been the landlord, which, as between himself and his son, he was not), whose statement, on inquiry, if he affirmed title in his son, was to be disbelieved. The complainant cannot, therefore, succeed on the theory of imputed knowledge.

The conveyance to Annie L. Conway, sister of James, was plainly fraudulent as against creditors. Although in court she failed to testify, the only evidence given on her behalf being that of William. He says that the consideration for the deeds made to her was that James promised her that if she undertook to support and take care of their mother, he would compensate her either in cash or by conveyance of property. The promise is said to have been made when the mother came to live at her son's house in 1899. Before that she and Annie had been living with Mrs. Thompson, William's aunt. After they came they occupied a part of the upper floor. They had their meals apart from the rest of the family. They were clothed and fed partly by the mother's money and partly by Annie's. How much each con-

tributed does not appear. The mother died in December, 1900, so that Annie's service, whatever it was, covered only a year and an indefinite number of months. They paid no rent. The service was presumably one that a daughter would render to her mother out of affection. Annie was able to tell what it consisted of, but did not. In fact, for aught that appears, the services may have been mutual and the mother may have contributed in money as much or more than Annie did. In the case of *Demarest* v. *Terhune, 18 N. J. Eq. 532*, it was held that where the transfer, injurious to the creditor, was not such as the court would set aside *in tolo* (and this is the most favorable view that can be taken of Annie's cause), it would be permitted to stand only as security for the amount *proved* to be really due. In the present case it does not appear that at the time the deeds were given any effort was made to ascertain the amount; and no proof of the kind of service rendered or its value was given at the trial. Under these circumstances, the conveyances cannot stand as against complainant's judgment.

*Messrs. Pitney, Hardin & Skinner,* for the appellant.

*Messrs. McCarter & English,* for the respondents.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion filed in the court below by Vice-Chancellor Stevens.

*For affirmance*—THE CHIEF-JUSTICE, SWAYZE, TRENCHARD, BERGEN, MINTURN, KALISCH, BLACK. WHITE, WILLIAMS, GARDNER—10.

*For reversal*—PARKER—1.